**Opinion issued July 7, 2015.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00963-CV

————————————

## MEDICAL DISCOUNT PHARMACY, L.P., LIFECHEK ROSENBERG GP, INC., LIFECHEK, INC. AND BRUCE V. GINGRICH, INDIVIDUALLY, Appellants

### V.

## THE STATE OF TEXAS, Appellee

On Appeal from the 434th District Court
Fort Bend County, Texas
Trial Court Case No. 12-DCV-196841

## MEMORANDUM OPINION

This is an appeal from a judgment imposing civil sanctions, injunctive relief, and attorney's fees based on violations of the Texas Food, Drug, and Cosmetic Act. We reverse in part and affirm in part.

## BACKGROUND

*The parties*

This case was brought by the Texas Attorney General, at the request of the State Commissioner of Health, against several related defendants for violations of the Texas Food, Drug, and Cosmetic Act [TFDCA]. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 431.001–431.415 (West 2010). Medical Discount Pharmacy, L.P. [MDP] is a licensed wholesale distributor of prescription drugs, and Bruce Gingrich is its president. Gingrich is also a licensed pharmacist who owns 29 Lifechek pharmacies. He formed MDP in 2008 to streamline the purchase of pharmaceuticals for his stores, and the pharmacies obtain a portion of their drugs directly from MDP. Typically, MDP purchases prescription drugs from other licensed prescription drug wholesalers, and the transaction is negotiated by a drug representative from the wholesaler. MDP pays the wholesaler, not the drug representative. MDP would then sell the drugs to Gingrich's Lifechek pharmacies or other small pharmacies in the area.

Lifechek Rosenberg, G.P. Inc. [Lifechek Rosenberg] is the general partner of MDP, and Lifechek, Inc., is its sole shareholder.

*The theft*

In 2009, 25,000 units of the prescription inhaler Advair were stolen from Glaxoklinesmith Pharmaceutical's warehouse in Richmond, Virginia. The thieves cut a hole in the roof of the warehouse, rappelled down, deactivated the alarm, and

loaded $5 million worth of Advair onto tractor trailer rigs, before disappearing for several months.

### *Stolen units purchased by MDP*

Approximately nine months after the theft, Bruce Gingrich, the president of MDP, was approached by Alex Oria, who offered to sell him Advair. The Advair was short-dated, or about to expire, and was being offered at 30% off the wholesale price. Gingrich knew Oria, had done business with him in the past, and knew that Oria and his company were not licensed to distribute prescription drugs in Texas. Gingrich accepted Oria's offer, and shortly thereafter Oria personally delivered at least 330 units of Advair to MDP's warehouse in Rosenberg, Texas. Gingrich was personally present when Oria delivered the Advair. Gingrich testified that Oria told him that the Advair came from Mercer Pharmaceuticals, which is a licensed Texas drug wholesaler, but Gingrich never received an invoice from Mercer, nor did Gingrich ever attempt to verify Oria's claim that Mercer supplied the Advair. Indeed, there is no evidence that Gingrich paid Mercer anything, but there was a cashier's check made out to Oria personally. Gingrich claimed that the check was not for the Advair, that he did not purchase the Advair from Oria, and that he believed that Oria was merely acting as a broker for Mercer.

3

*MDP/Gingrich ship the Advair to numerous pharmacies*

Shortly after Oria delivered the Advair, Gingrich directed Renae Clement, a receptionist for Lifechek, Inc., to ship an unknown number of the Advair units to 22 Lifechek pharmacies throughout Texas. Clement, on Gingrich's instruction, sent the stolen Advair to the 22 Lifechek pharmacies with a note that the shipment was "per Bruce." When one of the pharmacies asked about an invoice, Clement followed-up with an email, using her signature block as receptionist for Lifechek, Inc., in which she explained that she was filling in for Allyn Ross Eder, the manager of MDP's warehouse, and that the invoices would be sent the following week.

Shortly thereafter, Gingrich negotiated a transaction between MDP and Medicine Chest Pharmacy for the sale of 152 units of the Advair. An employee of Medicine Chest wanted to make sure that the units he purchased were not part of the stolen Advair, so he gave Gingrich the lot numbers of the stolen units. Gingrich claimed that this was the first time he had heard about any stolen Advair. He testified that he immediately asked MDP's warehouse manager, Eder, to check to make sure the units were not stolen before shipping them to Medicine Chest. Eder testified that she checked the numbers on two boxes and, when they did not match the stolen units, she completed the shipment to Medicine Chest, along with an invoice for $31,972,29.

***The FDA gets involved***

Shortly thereafter, a Medicine Chest representative informed Gingrich that the shipment it received from MDP contained stolen Advair. Medicine Chest and Gingrich reported the stolen Advair to the FDA. FDA representatives went to Medicine Chest and confiscated 152 units of Advair, which it matched by lot numbers to that stolen from Glaxosmithkline.

Gingrich then contacted the 22 Lifechek pharmacies and attempted to retrieve the remaining stolen Advair. The fax stated:

> Per Bruce, please send back the shorted Advair (exp. 2010) that you received from this office in late May. Bruce needs these to help fulfill an order for a customer by Wednesday June 30th.

The fax did not tell the pharmacies that the Advair was stolen or that the FDA was involved. Gingrich claimed that Eder drafted the fax, and that he never saw it.

Gingrich testified that the pharmacies returned 170 units of Advair. At least one unit had been sold to the public, because one customer returned a unit that was not working, and when the pharmacist called to report the defective unit, it was identified as stolen. There is no evidence how many more units had been sold because there was no record of how many units MDP sent to the pharmacies to begin with.

On July 6, 2010, the FDA arrived at MDP and confiscated the 170 units Gingrich had retrieved from the pharmacies. The FDA also seized a receipt for a cashier's check to Alex Oria from Bruce Gingrich in the amount of $15,600.

### State inspectors also visit MDP

Several weeks after the FDA had confiscated the 152 units from Medicine Chest and 170 units from MDP, inspectors from the State Health Department arrived at MDP. Gingrich initially denied possessing any Advair, but when confronted with it, he said that one of the pharmacies was late in returning its stolen Advair, and that he was holding it for the FDA. The department seized an additional 8 units of stolen Advair.

In all, MDP had sold at least 330 units of stolen Advair to pharmacies (152 to Medicine Chest + 170 to Lifechek pharmacies + 8 found in MDP warehouse by state inspectors). It is possible that more units were sold to the public before Medicine Chest identified the Advair as stolen.

### Oria is arrested

After the stolen Advair was confiscated from MDP, Gingrich assisted in the investigation of Oria by wearing a wire and allowing a tap on his cell phone. In July 2010, two months after delivering stolen Advair to MDP, Alex Oria was arrested in Florida and indicted for trafficking in contraband drugs, fraud, and money laundering. In 2012, he was arrested and charged by the U.S. Attorney in

New York for conspiracy to commit mail fraud, healthcare fraud, and money laundering.

*Previous TDFCA violations by the Defendants*

The Department also had a previous involvement with Gingrich and MDP in 2009. In that case, the Department sued MDP, Gingrich, and others for possessing Abilify, which the Department alleged was counterfeit because the lot numbers on the drugs in MDP's possession were different from the numbers manufacturer log numbers. Gingrich testified that he had purchased the Abilify from Ocean Pharmed, through a transaction negotiated by Alex Oria. However, neither Ocean Pharmed nor Alex Oria were licensed drug wholesalers in the State of Texas, another violation of the TFDCA.

The Department, MDP, Gingrich, Lifecheck Rosenberg, Lifechek, Inc., and others entered an agreed final judgment and permanent injunction. In the agreed judgment, MDP was assessed a $325,000 penalty, which would be reduced to $25,000 if MDP had the Abilify destroyed. The injunction prohibited the defendant from (1) "purchasing or receiving prescription drugs from entities not licensed in Texas as a wholesale drug distributor, [and], (2) "placing prescription drugs in commerce that were obtained from entities not licensed in Texas as a wholesale drug distributor." The injunction did not mention Alex Oria by name,

7

but Gingrich testified that he told the department he "would not buy prescription drugs from Alex Oria" again.

A few weeks after the agreed settlement was signed, Gingrich and Oria negotiated and agreed to the Advair transaction that is the basis of this lawsuit. Gingrich's position at trial was that he did not purchase the Advair from Oria, but that Oria merely acted as a broker for Mercer Pharmaceutical. However, there was never an invoice from Mercer, and MDP never paid Mercer, but there is evidence a check was made payable to Oria.

## JURY QUESTION NO. 10:  ADULTERATED DRUG

In Jury Question No. 10, the jury answered the following question regarding delivery of adulterated drugs:

> Did any defendant named below introduce or deliver for introduction into commerce any Advair that was adulterated?
>
> You are instructed that for purposes of answering this question "adulterated drug" means a drug that has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth or whereby it may have been rendered injurious to health.
>
> Please answer separately in the blank next to each defendant named with a "yes" or "no":
>
> | | | |
> |---|---|---|
> | (a) | Medical Discount Pharmacy, L.P | Yes |
> | (b) | Lifechek Rosenberg GP, Inc. | Yes |
> | (c) | Lifechek, Inc. | Yes |
> | (d) | Bruce V. Gingrich, Individually | Yes |

8

In their first issue on appeal, appellants contend there is no evidence that the stolen Advair was "adulterated," as that term was defined by the jury charge. Specifically, appellants contend that there is no evidence that the Advair was "prepared, packed, or held under insanitary conditions."

***Standard of review***

When, as here, an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Such a no-evidence challenge will be sustained when "'(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.'" *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (*quoting Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

In our legal-sufficiency review, "we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). Nonetheless, "[t]he final test for legal sufficiency must always be

whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. . . . [L]egal-sufficiency review in the proper light must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

If more than a scintilla of evidence supports the jury's finding, "the jury's verdict . . . must be upheld." *Miller,* 102 S.W.3d at 709. "[M]ore than a scintilla of evidence exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharms., Inc.*, 953 S.W.2d at 711). Conversely, evidence that is "'so weak as to do no more than create a mere surmise'" is no more than a scintilla and, thus, no evidence. *Id.* (*quoting Kindred v. Con/Chem., Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

*Analysis*

The State argues that there is sufficient evidence that the Advair was adulterated as a matter of law because it was stolen, and, as such, it was outside the normal distribution chain. This, the State contends, meets the definition of "adulterated" in the applicable statute, which provides in pertinent part:

A drug or device shall be deemed to be adulterated:

(2)(A) if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or

whereby it may have been rendered injurious to health; or (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drugs meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possses[.]

TEX. HEALTH & SAFETY CODE § 331.111(2)(A), (B) (West 2010).

The State contends that a drug is adulterated, by virtue of the statute above, "if the manufacturing requirements for the drug have not been met," and Tom Brink, the Manager of Drugs and Devices for the Texas Department of State Health Services, testified as follows:

[The stolen Advair is] adulterated by the statute. In other words, regardless of how any laboratory test[s] come out, the products are adulterated by virtue of the fact that they were held under unknown conditions for nine months.

Angie Bowles, an inspector for the State, testified that "[t]he fact that [the Advair] came from an unlicensed source and it was stolen is enough to show that [it was adulterated]."

We agree with the State that, had the jury been charged under subsection (2)(B) of the statute above, evidence that the Advair was stolen and removed from the regular distribution chain might show that the Advair was "adulterated" because the controls used for its "manufacture, processing, packing, or holding do

11

not conform to or are not operated or administered in conformity with current good manufacturing practice." *See* TEX. HEALTH & SAFETY CODE § 331.111(2)(B).

However, the jury was only charged according to section (2)(A) of the statute, which defined "adulterated" as drugs that "***have been prepared, packed, or held under insanitary conditions*** whereby it may have been contaminated with filth, or whereby it may be been rendered injurious to health." *See* TEX. HEALTH & SAFETY CODE § 331.111(2)(B) (emphasis added). In a jury trial, a legal-sufficiency complaint is not separable from the charge. "The sufficiency of the evidence must be measured by the jury charge when, as here, there has been no objection to it." *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005). This is true even if the charge's statement of the law is not correct. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). Here, the jury charge is not erroneous, but it does not include the subsection of the statute on which the State now relies. *See, e.g.*, *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

Thus, we review the sufficiency of the evidence to determine whether it is legally sufficient to show that the Advair was "adulterated," as that term was defined in the charge, *i.e.*, whether there was any evidence that it had been

12

"prepared, packed, or held under insanitary conditions[.]" The statute does not define "insanitary," so we give it its common meaning. *See City of Dallas v. Abbott*, 304 S.W.3d 380, 393 (Tex. 2010). "Insanitary" is defined as "unclean enough to endanger health: Filthy, contaminated." *Webster's Ninth New Collegiate Dictionary* 625 (9th ed. 1983).

Here, there is no evidence that the stolen drugs were held in unclean, filthy, or contaminated conditions. Indeed, Tom Brink testified that the Advair was "held under unknown conditions for nine months." On cross-examination of Gingrich during trial, the State's attorney asked, "We don't know how the Advair was stored during the nine months while it—after it was stolen from the warehouse and made its way to your office, we don't know that?" Gingrich responded, "Correct."

The following exchange also took place while Brink was testifying about the conditions under which the stolen drugs might have been kept:

> [Brink]: Well, realistically in this particular case, these products were stolen at the beginning of August, 2009 and did not hit the markets until the following year[], so these products were held essentially by thieves or gangs of thieves during the very hot part of the summer and it also went through a winter cycle as well. So typically in situations where you have stolen products like this, these gangs have no obligation or ethical concerns about maintaining the same standards for the product that a licensed distributer would have to comply with. And so these products in this particular situation, ***nine months elapsed before these products resurfaced and during that time we don't know how these products were handled that they were stolen***, presumably in tractor trailer trucks, if they were stored in those trucks without any kind of temperature controls—

[Defense Counsel]: Your Honor, at this point in time, I'm going to object to the witness speculating, he's admitted that they don't know what happened to these drugs, and so for him to go now and speculate further, we object.

[State's Counsel]: It's not speculation, Judge, we've already covered it, it's in the indictment that the federal prosecutors believed that this is how these drugs were handled, that they were in trucks, they were rental vehicles, they were storage, there were in uncontrolled conditions, it's already in evidence.

[Defense Counsel]: Your Honor, an indictment is not evidence.

[State's Counsel]: it's in the—it's in an exhibit.

[Trial Court]: Well—sir, do you have firsthand knowledge that these drugs were exposed to any of those things?

[Brink]: These specific, no, I do not.

[Trial Court]: Okay. Very well. I'll sustain the objection.

All of the evidence, even that provided by the State's witnesses, was that no one knew the conditions under which the stolen Advair had been held. Nevertheless, the State contends on appeal, as it did at trial, that the federal indictment[1] against Oria was some evidence that the drugs had been stored at improper temperatures. However, an indictment is not evidence. *Ex parte Dumas*, 110 Tex. Crim. 1, 2, 7 S.W.2d 90, 90 (1928); *Gonzales v. State*, 977 S.W.2d 189, 190 (Tex. App.—Austin 1998, pet. ref'd) ("[a]n indictment or information is not evidence").

---

[1] The federal indictment against Oria described the practice of Oria and his co-defendants of storing contraband drugs in "uncontrolled conditions, such as car trunks, residences and rented storage facilities, which may not be sufficient to maintain the medical efficacy of such drugs over time."

14

The State also argues on appeal that one patient's return of a stolen Advair unit because it was not working is some evidence that the drugs were held in insanitary conditions. However, while the record does show that one of the stolen units was returned, it in no way links that defective unit to insanitary storage conditions. Indeed, the record suggests that the plastic "gun" used to dispense the drug was broken, not that there was anything wrong with the drug itself.

Because all of the witnesses—both those for the defendants and the State— agree that no one knows the conditions under which the stolen drugs were kept before they were delivered to MDP, we must conclude that there is no evidence that the drugs were kept in "insanitary" conditions. As such, there is no legally sufficient evidence to support the jury's finding that the drugs were "adulterated," as that term is defined in the charge. We do not address the State's alternative argument that the drugs were adulterated as a matter of law under TEX. HEALTH & SAFETY CODE § 331.111(2)(B) because it never moved for directed verdict on that claim or to put that subsection in the jury charge.

## *Conclusion*

We sustain appellants' first issue on appeal. Accordingly, we reverse the civil penalties found in Jury Question 12 that were based on the liability findings in Jury Question 10, which we have held were not supported by legally sufficient

evidence. In light of our disposition of this issue, we need not address appellants'
remaining complaints regarding Jury Question 10 and decline to do so.

**JURY QUESTION NO. 1: RECEIPT AND DELIVERY OF STOLEN DRUG**

In Jury Question No. 1, the jury was asked the following question about the
delivery of stolen drugs:

> Did any defendant named below receive any Advair that was stolen
> and deliver such Advair or proffer for delivery such Advair for
> payment or otherwise?
>
> You are instructed that for purposes of answering this question that
> the State is not required to prove that the Defendants knew that the
> Advair was stolen.
>
> Please answer separately in the blank next to each defendant with a
> "yes" or "no":
>
> (a) Medical Discount Pharmacy, L.P.          <u>Yes</u>
> (b) Lifechek Rosenberg GP, Inc.              <u>Yes</u>
> (c) Lifechek, Inc.                            <u>Yes</u>
> (d) Bruce V. Gingrich, Individually          <u>Yes</u>

After answering the liability questions affirmatively, the jury found that MDA and
Gingrich had committed 330 violations and assessed each a $500,000 civil penalty.
The jury also found that Lifechek Rosenberg and Lifechek, Inc. had each
committed 178 violations and assessed civil penalties against Lifecheck Rosenberg
and Lifecheck, Inc. in the amount of $250,000 and $100,000, respectively.

In several related issues, appellants contend that (1) Lifecheck Rosenberg,
Lifechek, Inc., and Gingrich, individually, cannot be held liable for receiving

16

stolen Advair; and (2) there is no evidence that MDP delivered 330 units of stolen Advair. We address each argument, respectively.

*Multiple penalties against multiple defendants*

Defendants argue that there were, at most, 330 units of stolen Advair, and that the total violations found was 1,016. It is essentially defendants' position that MDP may have committed the 330 violations, but that Lifechek Rosenberg, Lifechek, Inc., and Gingrich, individually, did not and thus no violations may be assessed against them. The State argues that federal law interpreting a substantially similar federal Food, Drug, and Cosmetic Act ("FDCA") has held that corporate officers, as well as the corporations they work for, can be held liable for violating the FDCA. As such, the State contends that the TFDCA should be similarly interpreted. On this point, we agree with the State.

Section 431.0585 of the TFDCA provides that an enforcement action may be brought by the Attorney General against "a person":

> (a) At the request of the commissioner, the attorney general or a district, county, or city attorney shall institute an action in district court to collect a civil penalty from a person who has violated Section 431.021

TEX. HEALTH & SAFETY CODE §431.0585(a). A "person" is defined by the Act as including an "individual, partnership, corporation, and association." TEX. HEALTH & SAFETY CODE §431.002(28).

17

In *U.S. v. Dotterweich*, 320 U.S. 277, 278, 64 S. Ct. 134, 135 (1943), a corporation and its president/general manager were charged with delivering adulterated drugs under the FDCA. The statute similarly defined a "person" as including corporations and stated that any person who committed a violation of the act was guilty of a misdemeanor. *Dotterweich*, 320 U.S. at 281, 64 S. Ct. at 136. The Court first noted that all persons responsible for the violations were "equally guilty." *Id.* The Court noted that ***"[t]he offense is committed . . . by all who do have such a responsible share in the furtherance of the transaction*** which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs." 320 U.S. at 284, 64 S. Ct. at 138 (emphasis added). The Court then determined that "[i]t would be too treacherous to define or even to indicate by way of illustration the class of employees which stands in such a responsible relation[,]" and that "[t]o attempt a formula embracing the variety of conduct whereby persons may responsibly contribute in furthering a transaction forbidden by an Act of Congress, to wit, to send illicit goods across state lines, would be mischievous futility." 320 U.S. at 285, 64 S. Ct. at 138. Instead, the Court held that the jury should be allowed to determine the responsibility of the "persons" involved, subject to a review of the sufficiency of the evidence. "[T]he District Court properly left the question of the responsibility of Dotterweich for the shipment to the jury, and there was sufficient evidence to support its verdict." *Id.*

18

Thus, we conclude that multiple persons can be held responsible for the same delivery of adulterated drugs if there is sufficient evidence that each held "a responsible share in the furtherance of the transaction which the statute outlaws." *See* 320 U.S. at 284, 64 S. Ct. at 138.

### Legal sufficiency of the evidence

Thus, we now review the legal sufficiency of the evidence to support the findings of violations by each defendant.

### 1. Standard of review

When an appellant attacks the legal sufficiency of an adverse finding on an issue for which it did not have the burden of proof, it must demonstrate that there is no evidence to support the adverse finding. *Croucher*, 660 S.W.2d at 58. Such a no-evidence challenge will be sustained when "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *King Ranch, Inc.*, 118 S.W.3d at 751. "[W]e must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal–Mart Stores, Inc.*, 102 S.W.3d at 709.

*2. Gingrich, individually*

Appellants argue that the evidence is legally insufficient to hold Gingrich responsible because there is no evidence (1) that he personally received the stolen Advair, (2) that he personally delivered the stolen Advair to Medicine Chest, or (3) that any delivery or proffer for delivery was for payment or any other kind of remuneration to Gingrich personally and separately from MDP. Essentially, appellants argue that Gingrich cannot be held personally liable when he was acting on behalf of MDP.

We have already held that under *U.S. v. Dotterweich*, **"[t]he offense is committed . . . by all who do have such a responsible share in the furtherance of the transaction** which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs." 320 U.S. at 284, 64 S. Ct. at 138 (emphasis added). We believe that the same is true under the Texas statute. In tort cases, Texas courts have routinely found that "a corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the 'guiding spirit behind the wrongful conduct or the central figure in the challenged corporate activity.'" *Ennis v. Loiseau*, 164 S.W.3d 698, 707—08 (Tex. App.—Austin 2005, no pet.) (*quoting Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)). Hence, "[i]t is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the

service of their corporation." *Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). In *Texas v. Am. Blastfax, Inc.,* 164 F. Supp. 2d 892, 897–98 (W.D. Tex. 2001), the court found these tort principles applicable to a similarly worded statute with similar definitions, i.e., the Telephone Consumer Protection Act, and held that an officer may be personally liable under the statute if "he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved."

Here, Gingrich was not merely "tangentially involved" with the transaction. Gingrich testified that he (1) personally negotiated the transaction with Alex Oria to purchase the Advair; (2) was physically present when Oria delivered the Advair to his office in Rosenberg, Texas; (3) directed someone to send the Advair to the 22 Lifechek pharmacies in Houston; (4) negotiated a sale of 152 units of the Advair to Medicine Chest; and (5) directed someone to ship the Advair, along with an invoice, to Medicine Chest.

Because there is legally sufficient evidence showing that Gingrich "personally participated in the wrongdoing," "was the guiding spirit behind the wrongful conduct," and was not just "tangentially involved" in the wrongful conduct, we overrule appellants' challenge to the liability finding against him in

21

Jury Question No. 1 and the civil penalties found against him in Jury Question No. 3.

### 3. *Lifechek Rosenberg*

Appellants also contend that there is no evidence that Lifechek Rosenberg or Lifechek, Inc. received and delivered stolen Advair because MDP's and Gingrich's actions were not authorized by either company. The State responds that Lifecheck Rosenberg's "liability is based upon its status as the general partner of the limited partnership, [MDP]," and "the State was not required to present evidence of liability against Rosenberg apart from the evidence against [MDP]." In so arguing, the State relies on authority holding that general partners are generally liable for a limited partners obligations. *See Kao Holdings, L.P. v. Young*, 261 S.W.3d 60, 63-64 (Tex. 2008).

However, here the State is not merely attempting to hold Lifecheck Rosenberg liable for MDA's obligations; it is attempting to hold Lifechek Rosenberg liable *in addition to* MDA's liability. We do not believe that the statute permits the State to "double the penalty" by naming MDA and its general partner, Lifecheck Rosenberg, unless both personally participated in the wrongdoing and "have such *a responsible share* in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated

22

or misbranded drugs." *Dotterweich*, 320 U.S. at 284, 64 S. Ct. at 138 (emphasis added).

As we stated earlier, there is sufficient evidence that Gingrich, individually, "participated in the wrongdoing," when he, on behalf of MDP, negotiated the purchase of the Advair from Oria and then ordered it delivered to Medicine Chest and the Lifechek pharmacies. But, even though Gingrich may also be an officer of MDP's general partner, Lifecheck Rosenberg, there is no evidence that he was acting on behalf of Lifechek Rosenberg, or that Lifechek Rosenberg actively participated in the receipt and delivery of the Advair. The Advair sales to the pharmacies, had they actually been paid, would have been paid to MDP, not to Lifechek Rosenberg. Any benefit to Lifecheck Rosenberg would have been indirect, at best. There is simply no evidence, other than merely being the general partner of MDP, that Lifecheck Rosenberg "participated in the wrongdoing."

Accordingly, we sustain appellants' second issue challenging the liability finding against Lifechek Rosenberg in Jury Question No. 1 and the civil penalties found against it in Jury Question No. 3.

*4. Lifechek, Inc.*

Regarding Lifechek, Inc., the State points out that there is evidence of Lifechek, Inc's direct involvement with the stolen Advair because its receptionist, Renae Clement, shipped the Advair to the Lifechek pharmacies and followed up

that shipment with an email with her Lifechek, Inc. signature block stating that the shipment was sent "per Bruce." However, the undisputed evidence shows that Clement was "filling in" for Allyn Ross Eder, the manager of MDP's warehouse, who was on vacation, and as such, represented MDP, not Lifechek, Inc., when she forwarded the shipments to the pharmacies. Clement sent the shipments to the pharmacies at Gingrich's instruction, and we have already held that Gingrich was acting on behalf of MDP.

Here, the evidence shows only that Lifechek, Inc. is a shareholder of Lifechek Rosenberg, the general partner of MDP. That relationship alone, without further evidence that Lifechek, Inc. "participated in the wrongdoing," is insufficient to hold Lifechek, Inc. liable for violating the statute.

Accordingly, we sustain appellants' second issue challenging to the liability finding against Lifechek, Inc. in Jury Question No. 1 and the civil penalties found against it in Jury Question No. 3.

*5. MDP*

Appellants do not challenge the sufficiency of the evidence to show that MDP received and delivered the stolen Advair, but they do contend there is legally insufficient evidence to show that there were 330 violations. We disagree.

The evidence shows that MDP sent 152 of the stolen units to Medicine Chest and the FDA subsequently retrieved those units from Medicine Chest. The

24

evidence also shows that MDA sent an undetermined number of the stolen units to the 22 Lifechek pharmacies, which Gingrich asked the pharmacies to return via an email drafted by Eder, which stated:

> Please send back the short dated Advair expiration 2010 that you received from the office in late May. Bruce needs these to help fulfill an order for a customer by Wednesday, June 30th. To insure that your inventory is not depleted of products, please reorder the Advair today or tomorrow and send back the short dated Advair to the corporate office on Monday, via 2nd day mail.

The Lifechek pharmacies then returned the Advair at issue, and when the FDA subsequently inspected MDP, it seized 170 units whose lot numbers matched those of the stolen Advair. The jury could have reasonably concluded that the 170 stolen units recovered from MDP were the same units that MDP had sent, then retrieved, from the Lifecheck pharmacies.

In addition, when state inspectors went to one of the Lifechek pharmacies, they seized another 8 units of the stolen Advair. These totals (152+170+8) exactly equals 330, the number of violations found against MDP. And, even though MDP's manager, Allyn Eder, testified that she found at least two boxes of Advair whose lot numbers were not among those stolen, the jury was entitled to disbelieve her testimony. The jury is free to believe or disbelieve a witnesses' testimony in whole or in part. *Miller v. Kendall*, 804 S.W.2d 933, 939 (Tex. App.—Houston [1st Dist.] 1990, no writ). The jury is entitled to disbelieve a witness even though that witness is neither impeached nor contradicted. *Murphy v. Texas Farmers Ins.*

25

*Co.*, 982 S.W.2d 79, 85 (Tex. App.—Houston [1st Dist.] 1998), *aff'd*, 996 S.W.2d 873 (Tex. 1999).  In light of the 330 units of stolen Advair recovered from MDP, Medicine Chest, and the Lifechek pharmacy, the jury had legally sufficient evidence to support its finding that MDP committed 330 violations of the Act.

Accordingly, we overrule appellants' challenge to the liability finding against MDP in Jury Question No. 1 and the civil penalties found against it in Jury Question No. 3.

### *Alternative claim—Fatal conflict in jury charge*

As an alternative to its legal sufficiency claims, appellants argue that the jury's answers in Jury Question No. 1 are in fatal conflict because all of the defendants cannot have committed the same violations. Therefore, appellants request that, even if we do not reverse and render a take-nothing judgment based on legal insufficiency, we should at least reverse and remand.  However, as stated above, all persons responsible for the violations were "equally guilty."  *See Dotterweich*, 320 U.S. at 281, 64 S. Ct. 134 at 136.

### *Conclusion*

We reverse the portion of the judgment against Lifechek Rosenberg and Lifecheck, Inc. based on the liability findings against those entities in Jury Question No. 1 and the civil penalties found against them in Jury Question No. 3. We affirm the portion of the judgment against MDP and Gingrich, individually,

based on the liability findings against them in Jury Question No. 1 and the civil penalties found against them in Jury Question No. 3.

## JURY QUESTION NO. 4: FAILURE TO MAINTAIN PEDIGREE

In Jury Question No. 4, the jury was asked the following question and given the following instructions regarding violations of the statute for failing to maintain a required pedigree for the Advair at issue in this case:

Did any defendant named below fail to obtain, maintain, or provide a required pedigree for the Advair?

You are instructed for purposes of answering this question as follows:

"Pedigree" means a document or electronic file containing information that records each wholesale distribution of a prescription drug, from sale by a manufacturer, through acquisition and sale by any wholesale distributor or repackager, until final sale to a pharmacy or other person dispensing or administering the prescription drug.

A pedigree must include all necessary identifying information concerning each sale in the product's chain of distribution from the manufacturer through acquisition and sale by a wholesale distributor until final sale to a pharmacy or other person dispensing or administering the drug.

At a minimum, the chain of distribution information must include: i) the name, address, telephone number, and, if available, the e-mail address of each person who owns the prescription drug and each wholesale distributor of the prescription drug; ii) the name and address of each location from which the product was shipped, if different from the owner's name and address; iii) the transaction dates; and iv) certification that each recipient has authenticated the pedigree.

27

Each pedigree statement must be i) maintained by the purchaser and the wholesale distributor for at least three years; and ii) available for inspection and photocopying not later than the second business day after the date a request is submitted by the department or a peace officer in this state.

You are instructed that a person who is engaged in the wholesale distribution of a prescription drug, shall provide a pedigree for each prescription drug for human consumption that leaves or at any time has left the normal distribution channel and is sold, traded, or transferred to any person.

You are instructed that "wholesale distribution" means the distribution of prescription drugs to someone other than a consumer or patient. That terms does not include intracompany sales of prescription drugs, which means transactions or transfers or prescriptions drugs between division, subsidiary, parner, or affiliated or related company that is under common ownership and control, or any transaction or transfer between co-license holders of a co-licensed product.

You are instructed that a "wholesale distributor" means a person engaged in the wholesale distribution of prescription drugs, including, but not limited to a manufacturer, repackager, own-label distributor, private-label distributor, jobber, broker, manufacturer warehouse, distributor warehouse, or other warehouse, manufacturer's exclusive distributor, authorized distributor of record, drug wholesaler or distributor, independent wholesale drug trader, specialty wholesale distributor, third-party logistics provider, retail pharmacy that conducts warehouse wholesale distribution, and pharmacy warehouse that conducts wholesale distribution.

You are instructed that those who engage in intracompany sales of prescriptions drugs, which means transactions or transfers of prescription drugs between a division, subsidiary, parent, or affiliated or related company that is under common ownership and control are not required to obtain a wholesale license.

You are instructed a retail pharmacy or a pharmacy warehouse is required to provide a pedigree only if the pharmacy engages in the wholesale distribution of a prescription drug

You are instructed that "pharmacy warehouse" means a location which a person holds a wholesale drug distribution license under this subchapter, that serves as a central warehouse for drugs or devices, and from which intracompany sales or transfers of drugs or devices are made to a group of pharmacies under common ownership or control.

A person who is engaged in the wholesale distribution of a prescription drug, including a repackager, but excluding the original manufacturer of the finished form of a prescription drug, and who is in possession of a pedigree for a prescription drug must verify before distributing the prescription drug that each transaction listed on the pedigree has occurred.

In Jury Question No. 4, the jury found that MDP, Lifechek Rosenberg, and Gingrich had violated this provision, but Lifechek, Inc. had not. In Jury Question No. 5, the jury found 1 violation each for MDP, Lifechek Rosenberg, and Gingrich. And, in Jury Question No. 6, the Jury assessed a $25,000 civil penalty against each MDP, Lifechek Rosenberg, and Gingrich.

### Sufficiency of the pleadings

On appeal, appellants contend there was no pleading to support submitting the pedigree questions to the jury. A trial court abuses its discretion when it submits a jury question that is neither supported by the pleadings nor tried by consent. *Webb v. Glenbrook Owners Ass'n*, 298 S.W.3d 374, 380 (Tex. App.— Dallas 2009, no pet.) (*citing Stephanz v. Laird*, 846 S.W.2d 895, 902 (Tex. App.—

29

Houston [1st Dist.] 1993, writ denied)). Here, the issue of pedigree was not tried by consent because appellants objected, *see id.*, thus the issue is whether it was supported by the pleadings.

In the absence of special exceptions,[2] pleadings are to be liberally construed. *Lloyd's, U.S. Corp. v. Landis*, 777 S.W.2d 470, 473 (Tex. App.—El Paso 1989, writ denied). When the question is whether plaintiffs have stated a cause of action, the trial court looks to the intent of the pleader and may uphold the pleading and the judgment rendered even if some element of the cause of action has not been specifically alleged. *Lloyd's*, 777 S.W.2d at 473. Rule 45 of the Texas Rules of Civil Procedure requires that pleadings give fair notice of the claim or defense asserted. The purpose of the fair notice requirement is to provide the opposing party with enough information to prepare a defense or answer to the defense asserted. *See Paramount Pipe & Supply Co. v. Muhr*, 749 S.W.2d 491, 494 (Tex. 1988); *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Pleadings are sufficient if a cause of action or defense may be reasonably inferred from what is specifically stated. *See Boyles*, 855 S.W.2d at 601; *Gulf, Colorado & Santa Fe Ry. Co. v. Bliss*, 368 S.W.2d 594, 599 (Tex. 1963).

---

[2] Here, appellants did file special exceptions, but did not obtain a ruling on them before trial. Thus, their special exceptions are waived. *See Tri-State Ass'n of Credit Men v. Hinson*, 136 Tex. 1, 4, 144 S.W.2d 881, 882 (Tex. 1938).

The State's Second Amended Petition, the operative pleading on the first day of trial, alleged:

> Defendants, as alleged above and detailed below, have committed or caused to be committed the following acts prohibited and declared to be unlawful by Section 431.021 of the TFDCA:
>
> . . . .
>
> D. Failure to obtain and maintain records for receipt and distribution of prescription drugs and to permit inspection and copying of these records by TDSHS inspectors in violation of TFDCA §§431.021(g), (bb), **(gg), and (hh)**[.] (Emphasis added).

Subsections (gg) and (hh) alleged in the pleading above are set forth in Section 431.021 of the TFDCA, which provides as follows:

> Sec. 431.021. PROHIBITED ACTS. The following acts and the causing of the following acts within this state are unlawful and prohibited:
>
> . . . .
>
> (gg) failing to maintain or provide pedigrees as required by Section 431.412 or 431.413;
>
> (hh) failing to obtain, pass, or authenticate a pedigree as required by Section 431.412 or 431.413[.]

Sections 431.412 and 431.413, which are referenced in subsections (gg) and (hh), describe the pedigree requirements. Given the Second Amended Petition's specific reference to subsections (gg) and (hh) as prohibited acts under section 431.021 that appellants were alleged to have committed, and that the State alleged generally that

defendants failed "to obtain and maintain records[,]" we conclude that Jury Questions 4, 5, and 6 were supported by the pleadings.

*Sufficiency of the evidence*

Appellants do not contest the sufficiency of the evidence to support the pedigree findings and penalties against MDP, but they do contend the evidence is insufficient to find Gingrich and Lifechek Rosenberg liable, again arguing that only one defendant can be liable for each violation.

For the reasons we discussed above in relation to the receipt and delivery of stolen Advair, we similarly conclude that Gingrich can be held liable under the pedigree finding because there is legally sufficient evidence showing that he "personally participated in the wrongdoing," "was the guiding spirit behind the wrongful conduct," and was not just "tangentially involved" in the wrongful conduct. Accordingly, we overrule appellants' challenge to the liability finding against Gingrich in Jury Question No. 4 and the civil penalties found against him in Jury Question No. 6.

Previously, we held that Lifechek Rosenberg could not be held liable for other violations because there was no evidence, other than merely being the general partner of MDP, that Lifecheck Rosenberg "participated in the wrongdoing." The same is true for the pedigree violation. Accordingly, we

sustain appellants' challenge to the liability finding against Lifechek Rosenberg in Jury Question No. 4 and the civil penalties found against it in Jury Question No. 6.

*Conclusion*

We reverse the portion of the judgment against Lifechek Rosenberg based on the liability findings against that entity in Jury Question No. 4 and the civil penalties found against it in Jury Question No. 6. We affirm the portion of the judgment against MDP and Gingrich, individually, based on the liability findings against them in Jury Question No. 4 and the civil penalties found against him in Jury Question No. 6.

## JURY QUESTION NO. 7: AIDING AND ABETTING

In Jury Question No. 7, the jury was asked the following question and given the following instructions regarding violations of the statute for aiding and abetting an unlicensed wholesale distributor:

Did any of the defendant aid or abet an unlicensed wholesale distributor in engaging in the wholesale distribution of Advair?

You are instructed that a "wholesale distributor" means a person engaged in the wholesale distribution of prescription drugs, including, but not limited to a manufacturer, repackager, own-label distributor, private-label distributor, jobber, broker, manufacturer warehouse, distributor warehouse, or other warehouse, manufacturer's exclusive distributor, authorized distributor of record, drug wholesaler or distributor, independent wholesale drug trader, specialty wholesale distributor, third-party logistics provides, retail pharmacy that conducts warehouse wholesale distribution, and pharmacy warehouse that conducts wholesale distribution.

You are instructed that "wholesale distribution" is the distribution of prescription drugs to someone other than a consumer or patient.

You are instructed that "wholesale distribution" means the distribution of prescription drugs to someone other than a consumer of patient. The terms does not include intracompany sales of prescription drugs, which means transactions or transfers or [sic] prescriptions [sic] between division, subsidiary, parent, or affiliated or related company that is under common ownership and control, or any transaction or transfer between co-license holders of a co-licensed product.

You are instructed that those who engage in intracompany sales of prescription drugs, which means transactions or transfers of prescription drugs between a division, subsidiary, parent, or affiliated or related company that is under common ownership and control are not required to obtain a wholesale license.

You are instructed that "aid or abet" means to intentionally, knowingly, actively and substantially aid, promote, assist, pursue, take part in, further by cooperation in, lend air to or act in concert with a common plan.

In Jury Question No. 7, the jury found that MDP and Gingrich had violated this provision, but Lifechek Rosenberg and Lifechek, Inc. had not. In Jury Question No. 8, the jury found 1 violation each for MDP and Gingrich. And, in Jury Question No. 9, the Jury assessed a $25,000 civil penalty against each MDP and Gingrich.

Appellants contend "[t]here is no evidence that either MDP or Gingrich knew that the unlicensed wholesale distribution of prescription of drugs would occur if MDP delivered the Advair to Medicine Chest or the Lifechek pharmacies,"

34

and, "[a]t best, the evidence shows MDP may have inadvertently aided Oria in the wholesale distribution of the Advair." Specifically, Gingrich contends that he had no intent to aid Oria in the wholesale distribution of Advair because he did not know that Oria was acting as an unlicensed whole distributor.

Gingrich testified at trial that he was aware that Oria was not a Texas-licensed wholesale distributor, and he admitted that he had previously told the department inspectors that he "would not buy prescription drugs from Alex Oria." He further testified that he thought that Oria was a broker for Mercer, which was a Texas-licensed wholesale distributor, and that he was purchasing the Advair from Mercer, not Oria. However, the jury was entitled to disbelieve Gingrich's testimony that he believed that Oria was merely a broker, especially in light of testimony from other witnesses who testified that brokers merely facilitate sales, but do not themselves deliver drugs, as Oria did here. *See Miller*, 804 S.W.2d at 939 (stating jury is free to believe or disbelieve witnesses' testimony in whole or in part).

The evidence shows that (1) Gingrich personally negotiated the transaction with Oria to purchase the Advair; (2) was personally present when Oria himself delivered the stolen Advair; and (3) directed his employees to ship the stolen Advair to Medicine Chest and the Lifecheck pharmacies. After receiving the Advair directly from Oria, Gingrich received no paperwork or invoice from

35

Mercer, nor did he take any steps to verify Oria's story that Mercer was the source of the Advair. Finally, there was evidence from which the jury could have concluded that Gingrich paid Oria directly, via a $15,600 cashier's check. Such a direct payment to Oria undermines Gringrich's claim that Oria was merely acting as a broker, not an unlicensed wholesale distributer. As such, we conclude that there is legally sufficient evidence to support the jury's findings against MDP and Gingrich in Jury Question No. 7.

Gingrich also argues that the jury findings against him in Jury Question 7 cannot stand, again arguing that only MDP can be liable for the violation. For the reasons we discussed above, we again conclude that Gingrich can be held liable under the aiding and abetting finding because there is legally sufficient evidence showing that he "personally participated in the wrongdoing," "was the guiding spirit behind the wrongful conduct," and was not just "tangentially involved" in the wrongful conduct.

### *Conclusion*

Accordingly, we overrule appellants' challenge to the liability finding against MDP and Gingrich in Jury Question No. 7 and the civil penalties assessed against them in Jury Question No. 9.

## INJUNCTIVE RELIEF

In the final judgment, the trial court granted injunctive relief to the State as follows:

> The Court further ORDERS that a permanent injunction be issued, restraining and enjoining Defendant MEDICAL DISCOUNT PHARMACY, L.P.; LIKECHEK ROSENBERG GP, INC.; LIFECHEK, INC., and BRUCE V. GINGRICH, individually, their successors, assigns, officers, agents, servants, employees, attorneys, and any other person in active concert or participation with Defendants from engaging in the following acts or practices:
>
> > a. Receiving in commerce any drug that is stolen and the delivery or proffered delivery of such drug for payment or otherwise;
> > b. Failure to maintain records for receipt and distribution of prescription drugs, as required by law, and
> > c. Holding for sale or dispensing stolen drugs.

This injunction was sought and obtained by the State pursuant to Section 43.047 of the Health & Safety Code, which provides in part:

> (a) The commissioner, an authorized agent, or a health authority may petition the district court for a temporary restraining order to restrain a continuing violation of Subchapter B or a threat of a continuing violation of Subchapter B if the commissioner, authorized agent, or health authority finds that:
>
> > (1) a person has violated, is violating, or is threatening to violate Subchapter B; and
> >
> > (2) the violation or threatened violation creates an immediate threat to the health and safety of the public.
>
> (b) A district court, on petition of the commissioner, an authorized agent, or a health authority, and on a finding by the court that a

37

person is violating or threatening to violate Subchapter B shall grant any injunctive relief warranted by the facts.

* * * *

(d) The commissioner and the attorney general may each recover reasonable expenses incurred in obtaining injunctive relief under this section, including investigative costs, court costs, reasonable attorney fees, witness fees, and deposition expenses. . . .

TEX. HEALTH & SAFETY CODE ANN. § 431.047 (West 2010).

On appeal, appellants contend that "injunctive relief was not authorized because there was no ongoing or threatened violation of Subchapter B of the Act." The State contends that this complaint about the trial court's permanent injunction, made for the first time on appeal, has been waived. Appellants concedes that it did not object to the injunction at trial, but argues that lack of subject-matter jurisdiction can be raised for the first time on appeal,[3] and that, absent a finding of a continuing or threatened violation, the Health & Safety Code does not authorize the trial court to issue an injunction.

However, appellants confuse subject-matter jurisdiction, which involves a court's *power* to act, with its duty to decide correctly. Appellants' complaint here is that the trial court erred in granting injunctive relief absent evidence of "an ongoing or threatened" violation of the statute. This is an argument that the trial court erred, but not an argument that the trial court lacked subject-matter

---

[3]     *See Mapco, Inc. v. Carter*, 817 S.W.2d 686, 687 (Tex. 1991) (holding that lack of subject-matter jurisdiction is fundamental error that may be raised for first time at appellate level).

jurisdiction over the cause, the power to act as a court, the power to enter a judgment at all, or the capacity to act as a court. *See Hesser v. Hesser*, 842 S.W.2d 759, 764 (Tex. App.—Houston [1st Dist.] 1992, writ denied) ("Just because the judge had the duty to deny the motion does not mean that he had no jurisdiction to grant it. Jurisdiction is the power to adjudicate, that is, to grant or deny relief. Lack of subject matter jurisdiction is the absence of power to make any ruling at all."); *see also Decker v. Lindsay*, 824 S.W.2d 247, 249 (Tex. App.—-Houston [1st Dist.] 1992, orig. proceeding) (holding that void order must exceed court's authority to act and not be merely erroneous); *State ex rel. Latty*, 907 S.W.2d at 485 (setting out what renders judgment void); *In re State*, 159 S.W.3d 203, 207 (Tex. App.—Austin 2005, orig. proceeding) (holding "trial court's jurisdiction to act does not simply dissolve if an appellate court later disagrees with that court's determination that the [declaratory] relief was necessary and proper.").

Here, the statute clearly gave the trial court the *power* to act, i.e., it had subject matter jurisdiction to issue the injunction. Appellants' claim that the trial court acted erroneously in its application of the statute is not jurisdictional, and, as such, cannot be raised for the first time on appeal. TEX. R. APP. P. 33.1.

Because it was not preserved in the trial court, we overrule appellants' challenge to the trial court's grant of injunctive relief.

# ATTORNEY'S FEES

Pursuant to Section 431.047(d) of the Health & Safety Code, as set forth in the opinion above, the final judgment awarded the State reasonable and necessary fees and costs in the amount of $129,677.76. On appeal, appellants argue that "the attorney's fees award should be reversed because the Department was not entitled to injunctive relief." However, we overruled appellants' challenge to the trial court's grant of injunctive relief. For the same reason, we overrule appellants' challenge to the attorney's fees on this ground.

Appellants also argue that there is no evidence to support the judgment's award of attorney's fees and expenses because the State's evidence on attorney's fees was too general to apply the lodestar method in a meaningful manner. Specifically, appellant's contend that "the department offered only information about general categories of work[,]" and "identified no specific tasks and apportioned the time its lawyers purportedly spent only among general categories."

In *El Apple I, Ltd. v. Olivas*, the supreme court explained that generalities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method. 370 S.W.3d 757, 763 (Tex. 2012). Sufficient evidence includes, at a minimum, evidence "of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work

40

required." *Id.* at 764. Because the testimony in *El Apple* only included the total number of hours worked and generalities about discovery and the length of trial, the court remanded for a redetermination of attorney's fees. *Id.* at 765. In so holding, the court stated:

> In this case, neither attorney indicated how the 890 hours they spent in the aggregate were devoted to any particular task or category of tasks. Neither attorney presented time records or other documentary evidence. Nor did they testify based on their recollection of such records. The attorneys instead based their time estimates on generalities such as the amount of discovery in the case, the number of pleadings filed, the number of witnesses questioned, and the length of the trial. While all this is relevant, it provides none of the specificity needed for the trial court to make a meaningful lodestar determination. The court could not discern from the evidence how many hours each of the tasks required and whether that time was reasonable. Without at least some indication of the time spent on various parts of the case, a court has little basis upon which to conduct a meaningful review of the fee award.

*Id.* at 763.

The supreme court revisited the specificity requirements of evidence to support attorney's fees under the lodestar method in *Long v. Griffin*, 442 S.W.3d 253 (Tex. 2014). In *Long*, the supreme court characterized the attorney affidavit at issue as "only offer[ing] generalities":

> It indicates that one attorney spent 300 hours on the case, another expended 344.50 hours, and the attorneys' respective hourly rates. The affidavit posits that the case involved extensive discovery, several pretrial hearings, multiple summary judgment motions, and a four and one-half day trial, and that litigating the matter required understanding a related suit that settled after ten years of litigation. But no evidence accompanied the affidavit to inform the trial court the time spent on

specific tasks. *See El Apple*, 370 S.W.3d at 763. The affidavit does claim that 30% of the aggregate time was expended on the assignment claim (part of which the Griffins prevailed on) and that the assignment issue was inextricably intertwined with matters that consumed 95% of the two attorneys' time on the matter. But without any evidence of the time spent on specific tasks, the trial court had insufficient information to meaningfully review the fee request. *[City of Laredo v.] Montano*, 414 S.W.3d [731,] 736–37 [Tex. 2013)]; *El Apple*, 370 S.W.3d at 764.

*Id.* at 255.

In *Boyaki v. John M. O'Quinn & Assocs.*, PLLC, No. 01-12-00984-CV, 2014 WL 4855021, at \*15 (Tex. App.—Houston [1st Dist.] Sept. 30, 2014, pet. filed) (memo. op.), the attorney fee evidence provided:

[S]ince September 15, 2009, I have attended [several hearings], prepared a Motion for Temporary Injunction, prepared for the hearing. I have reviewed various drafts of letters and email correspondence to opposing counsel. I have communicated to my client, The O'Quinn Law Firm, the status of implementation of the settlement agreement, reviewed Texas cases on the enforcement of Rule 11 settlement agreements, reviewed Plaintiffs' First Amended Original Petition, reviewed Plaintiffs' Motion for Summary Judgment to Enforce Rule Settlement with supporting affidavits. I have also had a number of additional conferences with representatives of my client and co-counsel. Accordingly, since September 15, 2009, I have spent at least 98 hours in rendering the above-described necessary legal services . . . in enforcement of the mediated Rule 11 Settlement Agreement.

This Court held that the attorney's affidavit suffered the same deficiencies as those in *El Apple* and *Long* because it described the attorney's work "in generalities." *Id.*

The attorney's fees evidence in this case is much more detailed than that provided in *El Apple*, *Long*, or *Boyaki*. The State presented expert testimony regarding its attorney's fees, including the reasonableness and necessity of the work done on the case, the hours spent, the experience and qualifications of the timekeepers for the State, and the prevailing hourly rates of each. The State also submitted an affidavit, a summary of the hours worked and prevailing rates, and a computer-generated summary of the time records of all of the State's timekeepers who worked on the case. The computer generated time summery, entitled "Summary of Services Provided," identifies the case by name, each timekeeper by name and title, a description of each activity, and the hours devoted to that activity by each timekeeper. The activities are divided into categories such as "attend/appear at hearing," "drafting/revising pleadings," and "reviewing/researching law."

Appellants' claim, however, that the attorney's fee evidence is nonetheless insufficient because it does not say which hearings were attended, which pleadings were revised, and what law was researched. However, nothing in *El Apple*, *Long*, or *Boyaki* requires such detail. Indeed, *El Apple* faulted the evidence in that case because "neither attorney indicated how the 890 hours they spent in the aggregate were devoted to any particular task or ***category of tasks***." *El Apple*, 370 S.W.3d at

Here, the State's attorney's fees evidence complies with *El Apple* by indicating how long each person spent working on ***particular categories of tasks***.

As such, the State presented sufficient evidence for the trial court to conduct a meaningful review of the number of hours spent on the case by the State and to properly apply the lodestar method.

We overrule appellants' challenge to the attorney's fees awarded in the judgment.

## CONCLUSION

We reverse the judgment against Lifechek Rosenberg and Lifecheck, Inc. and render judgment that the State take nothing against them. We also reverse the judgment against all appellants on the State's claim for receiving and delivering adulterated drugs, and render judgment that the State take nothing against any of the defendants on that claim. We affirm the judgment as to MDP and Gingrich, individually, except as hereinabove reversed and rendered. We remand the case for entry of judgment in accordance with this opinion.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.

44